IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIKA RANDOLPH, *on behalf of herself and all others similarly situated*, | |
| Plaintiff, | Case No. 1:24-cv-10084 |
| v. | Honorable Sunil R. Harjani |
| DILLARD'S, INC., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

For most people, using the internet is a necessary and inescapable part of modern life. However, the ability to access information online is predicated on the ability to see and understand webpages. Thus, the inability to see presents a hurdle, but one which can be overcome using additional technologies, such as narration software. Plaintiff, Erika Randolph, alleges that Defendant, Dillard's, Inc., operated its website in a way that prevented blind and visually impaired individuals from successfully navigating it using this software, in violation of the Americans with Disabilities Act (ADA). Defendant has moved to dismiss based on the arbitration clause in its Terms of Use. Doc. [8]. Plaintiff argues that she did not agree to arbitrate when using the Defendant's website because she could neither see the terms nor navigate the website. For the reasons stated below, Defendant's motion [8] is denied without prejudice.

### Background

Defendant, Dillard's, Inc., is a Delaware Corporation that operates and controls Dillards.com, which is a commercial website that offers products and services for online sale. Plaintiff alleges that Dillard's has a policy and practice of denying the blind access to goods and

services offered by Dillards.com because of its failure to remove access barriers and preventing them from freely navigating Dillards.com. Plaintiff alleges that she, and other blind and visually impaired individuals, rely on Job Access With Speech (JAWS), a popular and downloadable screen-reading software program, to access and understand the content of webpages. *Id.* ¶¶ 24–25. According to Plaintiff the access barriers included: "inaccurate heading hierarchy, inadequate focus order, ambiguous link texts, changing of content without advance warning, inaccurate alt-text on graphics, redundant links where adjacent links go to the same URL address, and the requirement that transactions be performed solely with a mouse." *Id.* ¶ 32.

However, before reaching the merits of her claims, Defendant argues that Plaintiff should have arbitrated her claims based on the terms and conditions she agreed to by using Defendant's website. Defendant asserts that the below text box appears when individuals access its website:

> By visiting our website, you agree to our Terms of Use, including Section 16, Dispute Resolution and Arbitration. You also agree to the use of tracking technologies, such as cookies, to improve site functionality, personalize site content, analyze site traffic, advertise on other sites and record how you interact with our site. You can adjust how certain technologies are used on our site by clicking on the "Customize Settings". See Privacy Policy.
>
> Customize Settings       ✕

This text box includes the statement "By visiting our website, you agree to our Terms of Use, including Section 16, Dispute Resolution and Arbitration." Doc. [8-1] Ex. 1. Both the phrases "Terms of Use" and "Dispute Resolution and Arbitration" are blue hyperlinks that when clicked bring the user to the Terms of Use, and Section 16 of the Terms of Use respectively. *Id.* ¶ 5. Defendant asserts that this text box blocks the bottom portion of the webpage until the user clicks the "X" on the right side of the box. *Id.* Thus, it would be visible until closed by a visitor to Defendant's website. Defendant also asserts that the content of the text box is readable with JAWS but does not explain if the user must first click the text box for JAWS to read it or when JAWS would read the text box when a user opens Defendant's website. *Id.* ¶ 6. For her part, Plaintiff alleges that as a legally blind person, she had "significant difficulty knowing when" a new text

box or webpage popped up and that she "was disoriented when the automatic pop-up window appeared on the web page." Doc. [1] ¶ 35 (a). As such, as alleged by the Plaintiff, it is unclear how and when this text would be read by JAWS.

**Legal Standard**

The Supreme Court has repeatedly emphasized that arbitration is a creature of contract. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether an agreement to arbitrate has been formed is governed by state-law principles of contract formation." *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024). Although the parties disagree on which state law applies, in cases like this one involving whether an agreement to arbitrate has been formed, the analysis "calls for the application of general rules of contract formation, so the choice of law is not likely to affect the outcome." *Id*.

Although Defendant titled this motion as a motion to dismiss, its argument instead focused on why the Plaintiff should be forced to arbitrate her claims. "Under the [Federal Arbitration Act], arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). However, a "party 'cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "The Federal Arbitration Act actually provides for jury trials on the question of arbitrability if there is a factual dispute as to whether 'an agreement for arbitration was made.'" *Id.* at 751 (quoting 9 U.S.C. § 4).

The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Once the party

3

seeking to compel has done so, the party resisting arbitration bears the burden of identifying a triable issue of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). This burden is similar to that of a party opposing a motion for summary judgment. *Id.*

## Discussion

The general principle that a party who signs a written contract is presumed to have notice of the contract's terms can be challenging to apply to newer types of contracts formed on the internet. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Forming a contract requires mutual assent, and although the parties do not need to share the same subjective understanding of the terms, there "must be a meeting of the minds" regarding the terms. *Id.* "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." *Id.* at 1036.

When considering online agreements, courts often group them into two categories: clickwrap agreements and browsewrap agreements. Clickwrap agreements have "I accept" buttons or boxes that a customer can click. In contrast, browsewrap agreements "which provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions . . . typically are not enforced." *Domer*, 116 F.4th at 695 (citing *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) ("Courts are generally reluctant to enforce such agreements because they often leave users unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.") (internal quotation omitted). There are also "hybrid" agreements that fall in-between these two categories. These "hybrid" agreements typically "prompt the user to manifest assent after merely presenting the user with a hyperlink to the terms and conditions, rather than displaying the terms

4

themselves." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020) (internal quotation omitted).

Here, although Defendant initially argued that this was a "hybrid" agreement, it is a clear example of a browsewrap agreement, as the user is not required to affirmatively click on anything on the website to show acquiescence to the terms. While Defendant asserts that the user can click the "X" to remove the "intrusive text box" and that the text box covers part of the bottom of the screen, it does not assert that a user cannot use the website without closing that box. Doc. [8] at 10.

As this is a browsewrap agreement, to "avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). If a website owner cannot show the user had actual knowledge, then a user's passive assent is only enforceable if: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Domer*, 116 F.4th at 695 (quoting *Berman*, 30 F.4th at 856). At this stage, although the "questions may involve underlying facts," the court is addressing "questions of law" by undertaking "a fact-intensive legal analysis." *Id.*

I.  **Reasonably Conspicuous Notice**

As there is no evidence that Plaintiff had actual knowledge of the terms, the Defendant must instead establish that the notice was reasonably conspicuous such that a user would be deemed to have constructive notice of the terms. "Constructive notice depends on the design and content of the website itself." *Hussein v. Coinabul, LLC*, 2014 WL 7261240, at *2 (N.D. Ill. Dec.

5

19, 2014) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)). Courts evaluate notice from the perspective of a "reasonable online shopper—that is, a person who is neither an expert nor a novice with technology." *Domer*, 116 F.4th at 695 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)). The Seventh Circuit instructs courts to consider five factors when deciding whether a disclosure has afforded fair notice: "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action." *Id.* No single factor is dispositive; instead, the focus is on whether reasonable notice was provided when considering the whole webpage. *Id.*

Courts will reject browsewrap agreements when they do not provide sufficient notice to the user that they are agreeing to the terms. For example, in *Hussein*, the hyperlink to the terms of service was listed among ten other hyperlinks at the bottom of every page, and although the font color was adequately contrasting, its location—buried at the bottom of a webpage—without some additional act of notification was insufficient to provide reasonable notice. 2014 WL 7261240, at *3. Likewise, in *Van Tassell v. United Mktg. Grp., LLC*, the conditions of use did not appear on the homepage or the checkout pages; instead the user would only encounter them if they scrolled to the bottom of the homepage, then clicked on the customer service link, then scrolled to the bottom of that page and clicked the "Conditions of Use, Notices & Disclaimers" link located near the end of a list of links on that page. 795 F. Supp. 2d 770, 792 (N.D. Ill. 2011). Further, there was nothing else on the website that would alert customers to the fact that the terms were binding on all users outside of the terms and conditions. Thus, the district court found that this multi-step process was problematic and did not provide conspicuous notice to the user that they were agreeing to the terms.

6

Defendant's arguments focus on the simplicity of the screen and the size and coloring of the disclosure. Doc. [8] at 11–13. More specifically, Defendant argues that its homepage is simple and that the text box with the disclosure clearly provides the notice with a hyperlink to the terms. Defendant then asserts that the size and color of the disclosure and the blue hyperlinks to the terms make the disclosure stand out. However, these arguments are premised on the idea that the user can see the webpage and the text box with the disclosure.

Taking a step back, these factors are largely based on the disclosure's visibility on the screen. The Court sees the irony in evaluating the reasonableness of the notice through various visual mechanisms, such as font size and color, in a case involving a blind person. Such evaluation methods seem inappropriate when addressing claims of blind and visually impaired individuals, whose claims are that the website is inaccessible to them because of their sight-related disabilities. While the reasonableness test does not consider an individual plaintiff's familiarity with technology, *Domer*, 116 F.4th at 695, the Court does not view blindness the same. A website could have a notice in bold-colored highlighted text and that would make no difference to a blind person's ability to see it. Such a test would not be reasonable. Rather, it seems more appropriate, in this case, to judge whether there was reasonable notice by whether the JAWS system could and did read the pop-up message to the visually impaired person when they opened the webpage. Afterall, if someone cannot see the website, the specific font size and color of the text would not matter. But it does require that the website be coded correctly so the text reader can read it. The plaintiff alleges that it was not. Defendant submitted an affidavit stating that the text could be read. This fact dispute prevents the Court from determining if the notice was reasonably conspicuous to a visually impaired user.

This does not mean the factors are irrelevant but merely requires the Court to weigh the factors differently. What seems most relevant to a visually impaired individual's notice would be the clarity of the disclosure and its temporal relationship to a user's action. Defendant contends that the language of the disclosure—"By visiting our website, you agree to our Terms of Use, including Section 16, Dispute Resolution and Arbitration"—makes it clear what the user is agreeing to. But how this disclosure was presented to a visually impaired individual is where a disputed fact arises. Defendant asserts that the JAWS system could read the disclosure, but does not say whether this happens automatically when opening the page or whether the user must click on the text box to read it. Doc. [8-1] ¶ 6. But Plaintiff alleges she was "disoriented" when an automated text box appeared on the webpage, that she could not control moving content on the homepage, and that links had ambiguous text. Doc. [1] ¶ 35. Defendant also asserts that the text box cannot be removed unless a user clicks on the "X" in the corner, but the Plaintiff alleges that using a mouse to click on things is not something a visually impaired person can do. As such, whether the text of the disclosure was clear and readable to a visually impaired person is disputed. This issue also prevents a determination of whether the disclosure was temporally close to the visually impaired users' actions because how and when the text box is read by JAWS is disputed. Therefore, there are disputed facts that prevent a determination of whether the notice was reasonably conspicuous.

## II. Unambiguously Manifest Assent

Critically, even if there was reasonably conspicuous notice, there is no evidence currently before the Court that the Plaintiff unambiguously manifested assent to the terms. Returning for a moment to first principles, valid contract formation requires an offer and acceptance. *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). "An offer is the manifestation

8

of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012) (quoting Restatement (Second) of Contracts § 24 (1981)). Acceptance, in turn, requires an outward manifestation of assent to be bound by words or acts. *Sgouros*, 817 F.3d at 1034.

The rather unique problem here is that the Plaintiff, and the class she wants to represent, cannot see; they are visually impaired and legally blind. Here, Defendant does not contend, and Plaintiff does not allege, that Plaintiff had actual knowledge of the terms. So, whether she assented to the notice, when she never took an affirmative act and was merely passively on the website, is a fact-intensive question.

In the limited precedent available addressing the issue of assent with blind plaintiffs, courts have taken into account their inability to see when evaluating their actions. As an example, in the *National Federation of the Blind v. The Container Store, Inc.*, a group of plaintiffs filed a complaint alleging violations of federal and state discrimination laws for the failure to utilize tactile keypads so that blind patrons could independently use point-of-sale devices in stores. 904 F.3d 70, 74–75 (1st Cir. 2018). The defendant tried to enforce an arbitration provision in the terms and conditions of its loyalty program, of which the plaintiffs were members. Although the parties submitted evidence, including a defendant employee's affidavit and the defendant's training manual, and a hearing was held, the First Circuit found that the record was devoid of any evidence that the arbitration agreement was reasonably communicated to blind plaintiffs who signed up for its loyalty program in-store and devoid of any evidence that they manifested their assent to arbitration when they enrolled. *Id.* at 77, 83. And even though the "inability to read is not a defense to contract formation, . . . a party cannot enter into a contract to arbitrate when it does not know or

9

have reason to know the basic terms of the offer." *Id.* at 83 (internal citations omitted). So, the case came down to "whether the terms of the clause were so conspicuous that they nevertheless will be charged with constructive notice of its existence." *Id.* As there was "zero hint" that the terms and conditions applied to the plaintiffs' enrollment in the loyalty program, there was no evidence that the plaintiffs had actual or constructive knowledge of the arbitration terms, as such the defendant failed to meet its burden to establish an agreement was ever consummated. *Id.* at 84.

Here, the record is far less complete. The Defendant submitted a single two-page affidavit of an individual, who does not work for Defendant, but who reviewed its website using JAWS and an exhibit that included a portion of the Defendant's website's homepage with the text box containing the disclosure. From the Plaintiff, the Court has the allegations in her complaint about the difficulty navigating the website using JAWS. However, how the JAWS system reads the text box, when it reads it in comparison to the rest of the webpage, and whether a blind user needs to click the text box to read it (something Plaintiff asserts cannot be done by a visually impaired person) is not in the record. Based on these disputed facts, the Court cannot determine whether Plaintiff could have reasonably assented to the terms on Defendant's website.

The facts here are also similar to *Wilcosky v. Amazon.com, Inc.*, where the district court found that Amazon presented no evidence that the plaintiff ever clicked on the corner of the homepage to see the terms in the browsewrap agreement. 517 F. Supp. 3d 751, 766–67 (N.D. Ill. 2021). Thus, the district court refused to find that the plaintiff had constructive notice of the terms merely because he had registered Android devices with Alexa. *Id.* at 767.[1] Likewise in *Van Tassell*, the district court reviewed the defendants' interrogatory responses and the plaintiffs' allegations

---

[1] While the court in *Wilcosky* ultimately found that the plaintiff assented to the terms when making Amazon purchases, the analysis here is different because the Plaintiff never made a purchase and, therefore, could not have agreed to the terms as part of her purchase. 517 F. Supp. 3d at 767.

and determined that there was a material fact dispute regarding whether the plaintiffs ever viewed the terms, thus whether they could have agreed to them. 795 F. Supp. 2d 770, 788–89 (N.D. Ill. 2011). So, the district court denied the defendants' motion to compel arbitration without prejudice. Similarly, here, Defendant has not established that Plaintiff ever saw the terms or that the JAWS system would have read it to her when she opened the webpage. Thus, the disputed facts leave the Court unable to determine if the Plaintiff had constructive notice and assented to the terms.

Fortunately, the FAA provides a clear next step for cases such as this one, where there is a dispute about whether there was an agreement. When parties dispute whether they formed an arbitration agreement, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *see Deputy v. Lehman Bros.*, 345 F.3d 494, 509–10 (7th Cir. 2003) ("Section 4 thus required the court to hold a trial if the making of the arbitration agreement was in issue."); *Egan v. Live Nation Worldwide*, Inc., 764 F. App'x 204, 207–08 (3d Cir. 2019) (finding the district court must hold a trial when the defendant could not establish that the plaintiff saw the disclosure, as there was a genuine issue of material fact regarding whether the disabled plaintiff had notice of the arbitration agreement). When a trial is needed, the party allegedly in breach of the arbitration agreement can demand a jury, otherwise "the court shall hear and determine such issue." 9 U.S.C. § 4.

Courts routinely have either trials or evidentiary hearings to address the issue of whether the parties formed an arbitration agreement. *See, e.g.*, *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 729 (N.D. Ill. 2017) (finding a dispute as to whether the plaintiff accepted the contract when someone else created his Uber account for him, so a trial must be scheduled focused on the issues related to the formation of the arbitration agreement); *Fyrnetics (Hong Kong) Ltd. v. Quantum Grp., Inc.*, 2000 WL 1139907, at *1 (N.D. Ill. Aug. 10, 2000) ("[H]eld an evidentiary hearing to assist in determining whether the dispute that gave rise to this action is subject to

11

mandatory arbitration provisions contained in either or both of two contracts."). This is the necessary course of action here.[2]

## Conclusion

For the reasons stated above, Defendant's motion to dismiss [8] is denied without prejudice. A status hearing is set for April 22, 2025, at 9:30 a.m. The parties should be prepared to schedule a trial as a result of the Court's decision. To the extent that the parties believe that limited expedited discovery is necessary prior to such a trial, the parties should present their views at the status hearing. The parties are directed to meet and confer on these matters prior to the hearing.

**SO ORDERED.**

Dated: April 1, 2025

                                                    Sunil R. Harjani
                                                    United States District Judge

---

[2] As the Defendant's other arguments to dismiss depend on whether the parties entered into an agreement, the Court cannot find that they are a basis to dismiss Plaintiff's Complaint at this time.